# In the United States Court of Federal Claims

## OFFICE OF SPECIAL MASTERS
### No. 12-268V
### (To be Published)

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

PERCELL LIVINGSTON, *Father and*     \*
*Natural Guardian of* D.L., *a minor,*     \*
    \*     Special Master Corcoran
       Petitioner,     \*
    \*     Dated: June 26, 2015
       v.     \*
    \*     Attorney's Fees and Costs;
    \*     Reasonable Basis; Proof of
SECRETARY OF HEALTH AND     \*     Vaccination; Duty to
HUMAN SERVICES,     \*     Investigate Claim
    \*
       Respondent.     \*
    \*

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

*Clifford John Shoemaker*, Shoemaker and Associates, Vienna, VA, for Petitioner.

*Traci R. Patton*, U.S. Dep't of Justice, Washington, DC, for Respondent.

## ATTORNEY'S FEES AND COSTS DECISION[1]

On April 23, 2012, Percell Livingston, as father and natural guardian of D.L., a minor, filed a *pro se* petition seeking compensation under the National Vaccine Injury Compensation Program (the "Vaccine Program").[2] Two years later, Mr. Livingston's case was dismissed for insufficient proof of vaccination - a threshold issue in any vaccine case. Petitioner now requests an award of attorney's fees and costs in the amount of $31,146.41 for Clifford Shoemaker, Esq., the attorney who later appeared in the action on Petitioner's behalf. Respondent challenges this requested fee

---

[1] Because this decision contains a reasoned explanation for my actions in this case, I will post it on the United States Court of Federal Claims website, in accordance with the E-Government Act of 2002, Pub. L. No. 107-347, § 205, 116 Stat. 2899, 2913 (Dec. 17, 2002) (current version at 44 U.S.C. § 3501 (2014)). As provided by 42 U.S.C. § 300aa-12(d)(4)(B), however, the parties may object to the published decision's inclusion of certain kinds of confidential information. Specifically, under Vaccine Rule 18(b), each party has fourteen days within which to request redaction "of any information furnished by that party: (1) that is a trade secret or commercial or financial in substance and is privileged or confidential; or (2) that includes medical files or similar files, the disclosure of which would constitute a clearly unwarranted invasion of privacy." Vaccine Rule 18(b). Otherwise, the whole decision will be available to the public. *Id.*

[2] The Vaccine Program comprises Part 2 of the National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3758, codified as amended at 42 U.S.C. §§ 300aa-10 through 34 (2006) [hereinafter "Vaccine Act" or "the Act"]. Individual section references hereafter will be to § 300aa of the Act.

award, asserting that Petitioner's claim lacked reasonable basis even before he obtained counsel. As discussed below, I hereby deny Petitioner's fee request.

**Factual History**

D.L. was born at Ridgewood State Hospital on February 11, 2009. Pet., filed Apr. 23, 2012 (ECF No. 1), at 9; Amended Pet., dated April 15, 2013 (ECF No. 34) at ¶ 3; Pet'r's Ex. 4 at 4. When he was about seven months old, D.L. presented to his pediatrician, Dr. Anthony Ricciardi, on September 18, 2009, after experiencing a bout of diarrhea. Pet'r's Ex. 6 at 33; Pet'r's Ex. 26 at 7. According to the billing records from the treatment history filed in this case, Dr. Ricciardi administered to D.L. the RotaTeq vaccine[3] during this visit. Pet'r's Ex. 26 at 2.

D.L. had an office visit on March 10, 2011, approximately a month after turning two. Amended Pet. at ¶ 13. Mr. Livingston alleged in this case that during this visit he witnessed D.L. receiving a second dose of RotaTeq. As conceded by Respondent, if this in fact had occurred, it would have been medically inadvisable, as RotaTeq is not appropriately administered to infants over eight months of age. Rule 4(c) Report, dated June 16, 2014 (ECF No. 54) at 7. However (and as discussed in greater detail below), beyond Mr. Livingston's assertions, there is no direct, circumstantial, or otherwise corroborative evidence in the record establishing that D.L. actually received a second dose of the RotaTeq vaccine – at this time or any other.[4]

On March 15, 2011, D.L. was admitted to the Clara Maass Medical Center in Belleville, New Jersey after having a fever for two days and experiencing swelling of his lymph nodes in the left side of his neck for two weeks. Pet'r's Ex. 3 at 19. A week later, on March 23, 2011, D.L. was diagnosed with Kawasaki disease.[5] Pet. at 24; Amended Pet. at ¶15. He was discharged with an ultimate diagnosis of left cervical adenitis and a history of Kawasaki disease. Pet'r's Ex. 3 at 15. Following D.L.'s hospital discharge, D.L. was seen periodically thereafter for cervical adenitis, nasal congestion, conjunctivitis, and sleep apnea. Pet'r's Ex. 6 at 2-4, 22; Pet'r's Ex. 26 at 15, 17. By the end of 2012, D.L. had a normal echocardiogram, and D.L.'s pediatrician concluded that the Kawasaki disease had resolved. Pet'r's Ex. 14 at 20, 25-26.

---

[3] RotaTeq is a trademark for a preparation of a rotavirus vaccine. Rotavirus is a genus of viruses that can cause acute infantile gastroenteritis and diarrhea in young children. *Dorland's Illustrated Medical Dictionary* 1655 (32d ed. 2012) [*Dorland's*]. It is administered orally as a three-dose series to infants between the ages of 6 and 32 weeks, with the first dose being administered between 6 and 12 weeks. Pet'r's Ex. 23 at 1 and 4 (ECF No. 33-2).

[4] There is, however, evidence in the treatment history that the symptoms Petitioner alleges occurred after D.L.'s receipt of RotaTeq on March 10, 2011 may have begun a week and half before. Pet'r's Ex. 3 at 19. Indeed, a few weeks prior to that March visit, D.L. presented to Valley Hospital emergency room on January 27, 2011, in Ridgewood, New Jersey, and was diagnosed with the flu. Pet'r's Ex. 9 at 7-8. D.L. returned to the emergency room two weeks later for upper respiratory symptoms and lumps on his neck. *Id*. at 5. He was ultimately diagnosed with lymphadenopathy and viral illness. *Id*. at 2-3.

[5] Kawasaki disease is also known as mucocutaneous lymph node syndrome. *Dorland's* at 977.

**Billing/Record Evidence and Procedural History**

The present fees petition puts into contention whether and when Petitioner or his counsel knew, or should have known, that the evidence establishing D.L.'s receipt of a second RotaTeq vaccination was lacking. Because Petitioner submitted copies of his counsel's billing records in support of this petition, consideration of what those records reveal, within the context of the case's procedural history, will help shed light on the efforts of Petitioner and his counsel to address this significant threshold question.

Mr. Livingston initiated his claim as a *pro se* petitioner in April of 2012. Instead of a written pleading, however, he filed a collection of D.L.'s medical records and related documents that were construed by the Clerk of Court to constitute a Vaccine Act claim. *See generally* Pet. Included with the filed medical records was an incomplete ledger maintained by Dr. Ricciardi over two and a half years of D.L.'s care that chronicled D.L.'s pediatric visits, including his immunization history, plus D.L.'s New Jersey State Personal Immunization Record. Pet. at 5. Neither document mentions the RotaTeq vaccine having been administered on March 10, 2011, Mr. Livingston's allegations to the contrary, although neither document memorializes the earlier RotaTeq vaccine administration either.

Petitioner's counsel first learned of the case on May 7, 2012, barely a month after its filing (Mot. for Attorney Fees (ECF No. 61) ("Fee App.") at 19), although he did not formally appear in the matter until July 16, 2012. Mot. for Entry of Appearance and Aff. of Appointment (ECF No. 8). In the two-month interim period, Mr. Shoemaker spent 10.6 hours investigating and preparing for his appearance. Fee App. at 19-20. It appears that this time was spent mostly corresponding with Mr. Livingston, reviewing the available medical records, and dealing with paperwork related to appearing in the matter. *Id*. From the billing records it does not appear that during this time period Mr. Shoemaker made any attempt to verify proof of vaccination. After his appearance, Petitioner's counsel participated in an initial status conference with the special master first assigned to the case on July 17, 2012. Significantly, however, the billing records reveal that on that same day Mr. Shoemaker both e-mailed Petitioner, and then spoke to him, in a "long phone conference" about "contact with doctor" as well as "dates of RotaTeq administration." *Id.* at 20.

Petitioner thereafter embarked on a course of discovery – both to obtain medical records relevant to D.L.'s alleged injuries, along with proof of vaccination. ECF Nos. 11, 13, and 16. Thus, during the initial July 17th conference, Petitioner's counsel orally requested issuance of a "general subpoena authorizing his counsel to issue subpoenas for the relevant medical records in this case,"[6] and his request was granted by order dated July 18, 2012. ECF No. 9. Pursuant to that subpoena, additional medical records (including records from Dr. Ricciardi, Clara Maass Medical Center, and Valley Hospital) were obtained and filed three months later on October 18, 2012, but without

---

[6] All additional requests for subpoenas were made in writing, but all were similarly worded, requesting a general subpoena for all relevant medical records.

the necessary proof of vaccination. ECF No. 12.

Mr. Livingston subsequently renewed his motion requesting a general subpoena (which had expired), and the motion was again granted. ECF Nos. 13 and 14. On October 26, 2012, the special master extended Petitioner's deadline to December 26, 2012, for Petitioner to file all outstanding medical records. On December 7, 2012, Petitioner filed yet another motion to issue a general subpoena (ECF No. 16), which was for a third time granted. ECF No. 19.

Thereafter, on December 21, 2012, Petitioner filed additional medical records, none of which included any documents relevant to the vaccination question. ECF No. 21. After receiving another extension of time in which to file records in the case, on January 28, 2013, Petitioner filed additional medical records, but still did not provide the missing proof of vaccination. ECF No. 24. Petitioner then requested another extension of time of one month to file all outstanding records. ECF No. 23. Only one additional exhibit was filed on February 28, 2013, along with another request for an extension. ECF Nos. 25 and 26. Medical records, including a sleep study and medical records from another doctor, were filed on March 1, 2013. ECF No. 27. However, Petitioner had still not identified documentary proof of vaccination, or other corroborative direct or circumstantial evidence. Indeed – as the billing records reveal, by midwinter of 2013, Petitioner and his counsel had devoted the entirety of their discovery efforts to collecting general medical records, rather than the specific proof of vaccination that counsel knew was missing from the date of his appearance in the matter. *See, e.g.*, ECF No. 61 at 38-39 (listing expenses incurred in obtaining records from other hospitals and care providers, but making no mention of documents obtained from Dr. Ricciardi's pediatric practice or any attempts to contact Dr. Ricciardi).

Approximately a year after the case was initiated, Mr. Livingston filed a Statement of Completion on March 1, 2013. ECF No. 28. Petitioner was subsequently ordered to file an amended petition, along with additional medical records to substantiate his claim. Scheduling Order, filed Mar. 28, 2013 (ECF No. 29). In so doing, the special master expressly noted that no records had been filed in the case (by this time, nearly a year old) establishing that D.L. had received RotaTeq a second time as alleged. *Id.*

Petitioner then filed the amended petition, which specifically alleged that D.L. had suffered Kawasaki disease as a result of his alleged receipt of the RotaTeq vaccine on March 10, 2011. Amended Pet. at 2. It also fleshed out the alleged circumstances pertaining to the claimed second RotaTeq dose. Mr. Livingston alleged that he had witnessed a member of Dr. Ricciardi's practice, Dr. Roger Cooper, mistakenly administer RotaTeq a second time to D.L., and then attempt to hide the error (by refusing to acknowledge what he had done to Petitioner), as part of a larger effort to cover up "violating the suggested vaccination schedule." Reply at 4-5; Amended Pet. at ¶ 13.[7] If

---

[7] Petitioner also appears to have based his belief in part on the fact that he saw "the RotaTeq package insert" laying atop Dr. Cooper's desk – thereby presumably assuming that it correlated to whatever D.L. had received. Amended Pet. at ¶ 13.

true, this would explain why Dr. Ricciardi was unwilling simply to admit that his office had administered the second dose of RotaTeq, and why the existing vaccine ledger did not reflect it either.

In May of 2013, Mr. Livingston filed a status report requesting (yet again) additional time in which to complete the filing of medical records. *See* May 24, 2013 Mot. for Enlargement of Time and Status Report (ECF No. 35). In the report/motion, Petitioner explained that he had spoken to Dr. Ricciardi about the prior RotaTeq vaccine administered to D.L. in September of 2009, but needed to speak to him further about the alleged events of March 2011. *Id.* He also indicated that he had not yet been able to speak directly with Dr. Cooper (the treater alleged to have administered the relevant dose of RotaTeq) but would include that as a topic in speaking further with Dr. Ricciardi. The procedural record does not explain why these conversations could not have been conducted earlier in the case's history.

In response, the special master issued an Order on June 3, 2013. ECF No. 36. In it, she specifically noted that a status conference in the case held in March of 2013 discussed a matter similar to one addressed in a prior conference held in July 2012 after Mr. Shoemaker's appearance – "the fact that the petition and the records filed to date do not identify the vaccine alleged to have caused the injuries." *Id.* She also noted that Mr. Shoemaker had "acknowledged that no inquiry has been made of the doctor's office *in some time* and that additional inquiry was necessary." *Id.* (emphasis added). (In fact, the contemporaneous billing records reveal <u>no</u> efforts to contact Dr. Ricciardi until May of 2013 (ECF No. 61 at 24), even though counsel and Mr. Livingston had discussed the proof of vaccination issue at the time of Mr. Shoemaker's appearance. *Id.* at 20. The special master ordered Petitioner to either file the missing proof of vaccination, affidavits from Drs. Ricciardi and/or Cooper, or other evidence that he was making formal requests for the missing information, by August 2, 2013. ECF No. 36 at 2.

On August 2, 2013, in lieu of complying with the special master's order, Petitioner filed a "Status Report and Request for Hearing." ECF No. 37. In it, Petitioner attempted to show that he was trying to obtain the missing information but faced resistance from Dr. Ricciardi, suggesting that shoddy record-keeping practices were to blame. *Id.* Repeating his allegation that he had in fact witnessed D.L. receiving the RotaTeq vaccine in March of 2011, Petitioner asked that a fact hearing be scheduled so he could establish the matter through his own testimony. Status Report and Request for Fact Hearing, filed Aug. 2, 2013 (ECF No. 37). In response, the special master (by order dated August 5, 2013 (ECF No. 38)) noted that Petitioner had not complied with the August 2nd order requiring him to establish proof that he had formally requested the missing vaccine proof from Drs. Ricciardi and Cooper, and set a mid-August deadline to do so.

Two days later, Mr. Livingston filed affidavits from himself and his wife, although they pertained to their efforts to obtain discovery from Dr. Ricciardi rather than their underlying allegations about D.L.'s purported second RotaTeq dose. ECF No. 39. He followed that filing with

yet another discovery-based motion on August 14, 2013, requesting the issuance of subpoenas aimed at obtaining documents from Drs. Ricciardi and Cooper (ECF No. 40).

Little thereafter happened in the case[8] until it was transferred to me in January of 2014. ECF No. 47. On January 31, 2014, Petitioner at long last filed some additional documents obtained from Dr. Ricciardi. Pet'r's Ex. 26 (ECF No. 50-2).[9] Many of these materials appeared either duplicative of the documents first filed by Petitioner at the outset of the case, or (in the case of the New Jersey immunization record) were simply more complete versions of previously-filed records. None of these materials, however, supported Mr. Livingston's allegations that D.L. received a second RotaTeq vaccination in March of 2011. Indeed, a handwritten record from the March 10, 2011 visit that was filed with this compilation suggests that D.L. was administered "Rondec"[10] rather than RotaTeq (and it is conceivable in retrospect that the fact that the medicine has a similar name to the vaccine had something to do with Petitioner's confusion).

Petitioner subsequently filed a final statement of completion on April 15, 2014 (ECF. No. 53), with Respondent filing her Rule 4(c) Report approximately two months later. That Rule 4(c) Report observed, among other things, that even after multiple attempts to obtain additional documentation and compel the pediatricians to disclose medical records referencing the alleged second RotaTeq administration, Petitioner still lacked any direct or indirect proof of vaccination. ECF No. 54. A month later, Petitioner filed a Motion for Dismissal of his claim, acknowledging that he could not establish entitlement to a Program award. Mot. for Dismissal, filed July 10, 2014 (ECF No. 55). I granted the motion on July 11, 2014. ECF No. 56.

Mr. Livingston filed the present motion for reimbursement of attorney's fees and costs on

---

[8] After the retirement of the special master formerly presiding over the case, the matter was transferred for a short time to Special Master Hastings in the fall of 2013. During this period, Petitioner asked in September of 2013 for additional time to file the subpoenaed information (ECF No. 44), which was also permitted, but did not file any of these materials before I was assigned the matter.

[9] Although I presume that these materials constituted what had been obtained from Dr. Ricciardi after the many-month effort detailed above, the cover sheet of the documents filed indicates "[r]eceived from Client 4/17/2013" – suggesting that the materials were in the Petitioner's possession long before they were filed. Petitioner's reply in support of his fees petition (ECF No. 66) states that these materials were obtained in March of 2013. Reply at 4. There is nothing in the procedural record explaining why these documents could not have been filed earlier if in fact they had been in Mr. Livingston's possession. Indeed the status reports filed by Petitioner between April 17, 2013, and the time the records were filed in January of 2014, indicate that the doctors continuously maintained that they had already given copies of the records to Petitioner. *See, e.g.*, Status Report, filed Nov. 25, 2013 (ECF No. 46).

[10] Rondec is a prescription cough, cold, and allergy product consisting of dextromethorphan hydrobromide and pseudoephedrine hydrochloride. It is often administered orally. "Drugs," U.S. Food and Drug Administration http://www.fda.gov/Drugs/GuidanceComplianceRegulatoryInformation/EnforcementActivitiesbyFDA/SelectedEnfo rcementActionsonUnapprovedDrugs/ucm245106.htm (last accessed June 18, 2015). Given D.L.'s recent flu diagnosis, it is likely that Rondec was administered to provide D.L. with relief from his flu symptoms.

February 4, 2015, in accordance with the time permitted him under the Vaccine Rules.[11] In it, he requests a fee award of $30,023.96 for his attorney's time. Fee App. at 21. Mr. Livingston also requests $1,122.45 in costs incurred in this case. *Id*. at 1. In total, Petitioner requests fees and costs of $31,146.41. *Id*.

Respondent opposed Petitioner's fees and costs request on February 18, 2015, asserting that Petitioner's claim lacked a reasonable basis because it was evident from the outset of the matter that he could not prove vaccination, and therefore the request should be denied in its entirety. ECF No. 62 ("Fee App. Opp."). In so asserting, Respondent contended that before appearing as counsel of record, Mr. Shoemaker was obligated to conduct a thorough investigation into the threshold issue of proof of vaccination. *Id*. at 5.

Petitioner thereafter filed a reply on April 23, 2015, addressing each of Respondent's points in turn and re-asserting that his claim had a reasonable basis. ECF No. 66 ("Reply"). Petitioner specifically argued that the ambiguity of the treatment history record, in combination with Petitioner's adamant assertions that the RotaTeq vaccine had been improperly administered to D.L. in March of 2011, amounted to reasonable basis. *Id*. at 2-5. He also asserted that the applicable attorney professional responsibility and ethical conduct guidelines dictated his attorney's zealous representation, and that therefore his counsel's efforts, albeit unsuccessful, to establish D.L.'s receipt of the RotaTeq vaccine deserve compensation. *Id*. at 5.

Mr. Livingston's application for attorney's fees and costs is now ready for adjudication.

## ANALYSIS

## I.  General Principles Regarding Attorney's Fees and Costs Awards

Vaccine Program petitioners who receive compensation for their injuries are by statute entitled to an award of "reasonable" attorney's fees and costs. Section 15(e)(1). In those cases where compensation is denied, a special master may, in his or her discretion, award reasonable attorney's fees and costs if (a) the petition was brought in good faith; and (b) there was a reasonable basis for the claim for which the petition was brought. *Id.*; *Silva v. Sec'y of Health & Human Servs.*, 108 Fed. Cl. 401, 405 (2012) ("[s]pecial masters have broad discretion in awarding attorneys' fees where no compensation is awarded on the petitioner"). Thus, in the absence of a showing of *either* "good faith" or "reasonable basis" (since the two elements of this test are conjunctive), an application for attorney's fees may be denied.[12]

---

[11] Judgment entered on August 20, 2014. ECF No. 58. Counting from the date judgment entered, Petitioner's fee request was due 180 days thereafter or on or before February 16, 2015. Vaccine Rule 13(a).

[12] In rendering decisions on the entitlement of counsel to fee awards, some special masters have observed that the Vaccine Act effectively creates "three classes" of litigants: (i) prevailing litigants, whom the statute mandates "shall" receive an award of reasonable fees and costs; (ii) unsuccessful petitioners, who "may" in the special master's

Determining whether a petition was filed in good faith is a subjective inquiry. Good faith can be established as long as the petitioner demonstrates an honest belief that he suffered a compensable vaccine injury. *See Di Roma v. Sec'y of Health & Human Servs.*, No. 90-3277V, 1993 WL 496981, at *1 (Fed. Cl. Spec. Mstr. Nov. 18, 1993). This element is therefore the more easily established of the two. *Austin v. Sec'y of Health & Human Servs.*, No. 10-362V, 2013 WL 659574, at *7 (Fed. Cl. Spec. Mstr. Jan. 31, 2013) ("[d]ue to its subjective nature, the standard for good faith is very low"). Indeed, some cases stand for the proposition that absent an affirmative showing that a petitioner acted in bad faith, a petitioner is entitled to a presumption of good faith. *Grice v. Sec'y of Health & Human Servs.*, 36 Fed. Cl. 114, 121 (1996). Here, I see no evidence suggesting Petitioner did not act in good faith in proceeding with this claim, nor does Respondent argue to the contrary. *See* Fee App. Opp. at 4.

The reasonable basis requirement, by contrast, involves an objective inquiry with no such favorable presumption. *See McKellar v. Sec'y of Health & Human Servs.*, 101 Fed. Cl. 297, 303-34 (2011) (citing *Perreira v. Sec'y of Health & Human Servs.*, 33 F.3d 1375 (Fed. Cir. 1994)) ("[t]he petitioner must affirmatively establish a reasonable basis to recover attorneys' fees and costs")). An assessment of reasonable basis "look[s] not at the likelihood of success but more to the feasibility of the claim." *Di Roma*, 1993 WL 496981, at *1.

There is no explicit instruction from the Federal Circuit as to the precise nature of the evidentiary burden imposed on a petitioner attempting to establish reasonable basis. Rather, the analysis has been characterized as requiring application of a "totality of the circumstances" test that will vary in form depending upon a case's circumstances. *Chuisano v. United States*, 116 Fed. Cl. 276, 288 (2014). If nothing else, an unsuccessful petitioner has *some* burden of showing that his case was reasonably pursued. *McKellar*, 101 Fed. Cl. at 304; *Chuisano*, 116 Fed. Cl. 276 at 286.

In determining reasonable basis, other special masters have considered whether a claim has support in the contemporaneous medical records and/or a medical opinion, or if the petitioner can demonstrate at least that "fundamental inquiries" were made to locate evidentiary support for the claim. *Melbourne v. Sec'y of Health & Human Servs.*, No. 99-694V, 2007 WL 2020084, at *6 (Fed. Cl. Spec. Mstr. June 25, 2007) (petitioner cannot obtain fee award for work performed after reasonable basis ceases to exist, *e.g.*, after counsel becomes aware that the medical record or expert opinion fails to support the claim); *Di Roma*, 1993 WL 496981, at *2.

The scope and sufficiency of an attorney's investigation into the basis for a petitioner's

---

discretion receive a fee award if the proper criteria are established; and (iii) unsuccessful petitioners who cannot demonstrate the proper criteria – historically a "very small" class of litigants. *Chuisano v. Sec'y of Health & Human Servs.*, No. 07-452V, 2013 WL 6234660, at *10 (Fed. Cl. Spec. Mstr. Oct. 25, 2013), *aff'd*, 116 Fed. Cl. 276 (May 15, 2014) (citing *Austin v. Sec'y of Health & Human Servs.*, No. 10-362V, 2013 WL 659574, at *7 (Fed. Cl. Spec. Mstr. Jan. 31, 2013)).

claim is also relevant to determining if reasonable basis existed for a claim. *See Di Roma*, 1993 WL 496981, at *2 (citing *Lamb v. Sec'y of Health & Human Servs.*, 24 Cl. Ct. 255, 258-59 (1991)). Vaccine Program attorneys are expected to conduct a reasonable pre-filing investigation – including at a minimum an evaluation of the factual bases for a claim. *See Turner v. Sec'y of Health & Human Servs.*, No. 99-544V, 2007 WL 4410030, at *7 (Fed Cl. Spec. Mstr. Nov. 30, 2007). In determining the adequacy of the pre-filing inquiry, special masters have considered the circumstances under which the petition was filed, including whether petitioner filed with the assistance of counsel, and if so, how much time before the filing deadline petitioner provided counsel for pre-filing investigation. *Turner,* 2007 WL 4410030, at *6.[13]

Although in the history of the Vaccine Program special masters have tended to be "quite generous in finding a reasonable basis for petitioners" in granting fee awards in unsuccessful cases, that generosity wanes where it is evident that counsel failed to investigate sufficiently the facts underlying the claim. *Riley v. Sec'y of Health & Human Servs.*, No. 09-276V, 2011 WL 2036976, at *3 (Fed. Cl. Spec. Mstr. Apr. 29, 2011) (citation omitted); *see also Murphy v. Sec'y of Health & Human Servs.*, 30 Fed. Cl. 60, 62 (1993) (affirming denial of attorney's fees where contemporaneous records provided no basis for alleged injury), *aff'd*, 48 F.3d 1236 (Fed. Cir. 1995); *Di Roma*, 1993 WL 496981, at *3 (denying attorney's fees and costs where "[m]inimal research and good sense should have indicated that th[e] case had no basis under the law").

In particular, special masters have denied fee awards in cases in which a petitioner's claim was found to lack reasonable basis because the case was pursued despite the evident fact that the petitioner could never demonstrate that she received a vaccine set forth on the Vaccine Injury Table. *See, e.g.*, *Cortez v. Sec'y of Health & Human Servs.*, No. 09-176V, 2014 WL 1604002 (Fed. Cl. Spec. Mstr. Mar. 26, 2015); *Schmidt v. Sec'y of Health & Human Servs.*, No. 11-410V, 2012 WL 1392632 (Fed. Cl. Spec. Mstr. Mar. 30, 2012); *Rydzewski v. Sec'y of Health & Human Servs.*, No. 99-571V, 2008 WL 382930, at *7-8 (Fed. Cl. Spec. Mstr. Jan. 29, 2008) ("[r]eceipt of a vaccine is an indispensable part of the Vaccine Program").

The specific facts of *Rydzewski* are especially instructive under the present circumstances. In *Rydzewski*, the petitioner (who initiated the action as a *pro se* litigant) had been administered hexabrix (an agent that creates contrasts when used during arteriograms and other procedures) in connection with a September 1995 cardiac catheterization procedure. 2008 WL 382930, at *1. The petitioner, however, alleged that she had received and been injured by the Hepatitis B vaccine (which, if true, would unquestionably serve as the basis for a Vaccine Program claim). *Id*. at *4-

---

[13] This flows naturally from the fact that (even if this requirement is not always expressly adhered to) Section 11(c)(1)(A) of the Act contemplates that petitioners will include with their petition an affidavit and documentation that the injured party received a vaccine set forth in the Vaccine Injury Table, and that such vaccine caused the alleged injury.

5.[14] The petitioner originally filed her claim on her own, but counsel appeared for her approximately five months later. *Id.* at *2. After the special master entered an order denying petitioner compensation for insufficient proof of vaccination, the petitioner filed a fee application seeking to recover approximately $9,000 in fees and costs. *Id.*

The *Rydzewski* special master held that the petitioner lacked reasonable basis when she filed the petition, since, despite her *pro se* status, she could have confirmed pre-filing whether a vaccine had been administered to her by review of her own medical records. *Id.* at *3. But he found that "the lack of a reasonable basis [was] even more evident after the time Petitioner obtained counsel." 2008 WL 382930, at *7. Despite evidence (revealed in counsel's billing records) that petitioner's attorneys had conferred with their client about the status of the medical records collection – and in particular, had received some documentation already collected by her – and were therefore aware of the issue, counsel proceeded "without having persuasive evidence to establish the most basic of elements – that Ms. Rydzewski received a covered vaccine." 2008 WL 382930, at *8. Because counsel was reasonably presumed to understand that establishing that a claimant had received a covered vaccine is a critical component of any Program claim, counsel's failure to diligently investigate the matter, and thereby avoid wasting time and resources, made a fee award inappropriate.

## II.    Reasonable Basis in Petitioner's Case

Proof of vaccination is a fundamental threshold issue in all Vaccine Program cases – for absent evidence that a covered vaccine was administered, a petitioner has no grounds for proceeding with a claim in this forum. *See, e.g.*, *Rich v. Sec'y of Health & Human Servs.*, No. 12-742, 2013 WL 4476751 (Fed. Cl. Spec. Mstr. July 26, 2013); § 11(c)(1) (setting forth necessary contents for a petition, which include establishing proof of vaccination). The lack of such proof at a case's outset is not necessarily fatal to a claim, however. *Centmehaiey v. Sec'y of Health & Human Servs.*, 32 Fed. Cl. 612, 621 (1995). A petitioner can overcome the lack of direct proof of a vaccine having been administered by marshaling a variety of circumstantial evidence tending to establish that he did in fact receive the alleged vaccine. *See, e.g., Lamberti v. Sec'y of Health & Human Servs*, No. 99–507V, 2007 WL 1772058, at *7 (Fed. Cl. Spec. Mstr. May 31, 2007) (finding multiple medical record references to vaccine receipt constituted adequate evidence of administration); *Groht v. Sec'y of Health & Human Servs*, No. 00–287V, 2006 WL 3342222, at *2 (Fed. Cl. Spec. Mstr. Oct. 30, 2006) (finding a treating physician's note—"4/30/97—Hep B. inj. # 1 (not given here) (pt. wanted this to be charted)"—to be sufficient proof of vaccination).

From the start of this case, Mr. Livingston was on notice that establishing D.L.'s receipt of RotaTeq in March 2011 was not merely a matter of obtaining a document from a pharmacy or treating physician. What documentary evidence of D.L.'s vaccination history that the Petitioner

---

[14] The *Rydzewski* special master inferred that the petitioner in that case may have confused "hexabrix" with "hepatitis B," given their homophonous similarities. *Rydzewski,* 2008 WL 382930, at *4.

did possess (such as the vaccine ledger) did not substantiate his recollection, and D.L.'s subsequent treatment history made no reference to his having received a second RotaTeq dose. Mr. Livingston would thus require other circumstantial proof to substantiate his personal recollection – either the admissions of Drs. Ricciardi and/or Cooper that Mr. Livingston's recollection was correct, or some kind of other persuasive evidence that their denials were false, such as internal office records recording the alleged vaccination.

Mr. Livingston was never able to locate such proof, even after eighteen months. But as the billing records strongly suggest, far more could have been done *early on*, and with counsel's help, to evaluate the claim's viability. Mr. Shoemaker appeared in this matter approximately three months after the case had been filed as a *pro se* matter, but was aware of it a month after its filing. It is indisputable that he possessed at that time the compiled materials constituting Mr. Livingston's petition, and was aware from the exact date of his appearance, if not earlier, of the proof of vaccination issue. The action itself was filed about a year from the date of the alleged RotaTeq vaccine in 2011, meaning that there was no time pressure to act in the face of the pending expiration of the Act's three-year statute of limitations. Section 300aa-16(a)(2). Counsel thus had ample time prior to his appearance to investigate the proof of vaccination issue.

Based on the above, I find that, because of the clear absence of proof of vaccination from the case's outset, reasonable basis for Mr. Livingston's case was lacking – if not at the time Mr. Livingston initiated the claim, then certainly by the time Mr. Shoemaker appeared for him a few months after. Petitioner and his counsel could have done far more to address the matter at the outset of this proceeding. If counsel are to be compensated in losing cases where such a threshold issue cannot be established, then they should at least be able to demonstrate appreciation of the importance of the issue, as well as diligence in addressing it.

Admittedly, reasonable basis can change over a matter's progression. *Perreira*, 33 F.3d at 1377. Thus, in some circumstances it would be proper to grant a partial attorney's fees award to compensate counsel for some post-filing discovery efforts to establish proof of vaccination – especially where counsel have demonstrated efficiency and diligence in pursuing the issue, given its baseline importance to any Program claim.

Two factors militate strongly against awarding a partial fees award in this case. First, the procedural history (amplified by the billing records) suggests that counsel's pre-appearance investigation of the matter was inadequate. As noted above, Mr. Shoemaker appeared in the case only three months from its date of filing, was under no time pressure from a pending limitations cut-off date to act, and was aware as of the date of his appearance that proof of vaccination was at issue (since the billing records reveal that Petitioner spoke to his counsel about just that topic on the day counsel first appeared). He thus had ample time before appearing to review the case records and make obtaining proof of vaccination a priority. He could have informally contacted D.L.'s

treaters, like Dr. Ricciardi, to inquire about Mr. Livingston's allegations, and why the vaccination ledger made no mention of the purported second dose.[15] Had Dr. Ricciardi resisted such contact, counsel could have (upon his appearance in the case) immediately brought that to the attention of this forum and requested a subpoena specifically directed at Dr. Ricciardi. Focused, limited discovery on the topic might have resolved the issue in a few months.

Instead, Petitioner's counsel spent a significant amount of time collecting general medical records. Counsel did not home in on the vaccination question until the spring of 2013, even though (as the billing records show) he was aware of it as of the day of his first status conference in the matter. And as of the spring of 2013 (a year from the filing of this action), counsel was in possession of written records that contradicted Petitioner's recollection (*see, e.g.,* Ex. 26), but did not file them in this matter until early 2014. Only when it was beyond dispute that Petitioner could not prove his case did he ask to dismiss his claim – but by this point, counsel had billed 66.7 hours in attorney time alone (at a requested rate of $348.70/hour) working on the case, with his firm running up a bill in excess of $30,000.

Petitioner's rationalizations for the lengthy discovery process in which his counsel engaged are not persuasive. Mr. Livingston argues that the records he initially obtained after issuance of the first subpoena (and then filed on October 18, 2012) were "extremely sloppy and incomplete," and thus gave substance to Petitioner's suspicion that Drs. Ricciardi and Cooper were attempting to hide the fact of the second RotaTeq administration. Reply at 2-4. But it is not clear from the billing or procedural records that in fact the most relevant pediatric records were even requested until much later in the case's history. And while such a lengthy discovery effort might be justified where there is other circumstantial evidence supporting the vaccination allegation (such as references to the vaccine's administration in the treatment history), it is not justified under these circumstances, where the sole basis for the allegation of vaccination is Petitioner's recollection.

Second, Mr. Shoemaker's experience with Vaccine Program cases[16] bears on my

---

[15] The pre-filing availability of the individual alleged to have administered a vaccine to answer a Petitioner's questions can be highly relevant in resolving reasonable basis. In *Cortez*, for example, a petitioner had ample time before a case was filed to speak to the physician who had purportedly administered the flu vaccine she claimed had caused her injury, and was in possession of the medical records contradicting her claim. Instead, she and her counsel waited until years into the case before contacting the treater - at which point he resolved the question by recalling, as the medical records already indicated, that he had not administered the vaccine as alleged, but instead had only administered a blood pressure injection. *Cortez*, 2014 WL 1604002, at *9.

[16] Currently Mr. Shoemaker is attorney of record in twenty-seven active Vaccine Program cases. According to his website, his firm's stated mission is to "represent children and adults who are injured by vaccinations," and Mr. Shoemaker (who graduated from law school 32 years ago) has a practice consisting "almost exclusively" of vaccine litigation. "Clifford J. Shoemaker," Shoemaker & Associates http: //www.shoemakerassociates.com/ index.php?option=com_content&view=article&id=15&Itemid=66 (last visited June 5, 2015).

determination that his investigation was inadequate.[17] It is reasonable to expect experienced counsel to understand the importance of establishing the fact of vaccination as soon as possible. And Mr. Shoemaker is not only experienced counsel, but has specific familiarity with these very circumstances – as he was also counsel in *Rydzewski*, a factually-similar case also involving an initially *pro se* litigant. There, as here, it was known from the beginning of the case that proof of vaccination was a significant issue in the case, and it appeared (as in the present case) that the petitioner may have mistakenly believed that a vaccination was administered based on a misapprehension of the name of the treatment in question.[18] Equally, in this case and *Rydzewski*, Mr. Shoemaker appeared in the matter months after it was initiated by a *pro se* petitioner, and had adequate time to conduct an investigation. Yet Mr. Shoemaker devoted considerable attorney time (there and here) in the attempt to prove the matter through discovery. Mr. Shoemaker therefore has been on notice since 2008 (when *Rydzewski* was published) of the need to exercise special diligence when accepting a formerly *pro se* case where proof of vaccination is plainly at issue.

Mr. Livingston argues that it was reasonable for his attorney to rely on Petitioner's word in averring that D.L. received a second RotaTeq vaccination, and that this should inform my reasonable basis analysis. Reply at 3. This argument, however, confuses the reasonable basis prong of the test with the good faith prong. Reasonable basis is not measured by whether Petitioner (or his counsel, for that matter) possesses a subjective good faith belief in the facts as alleged, but is instead an *objective* inquiry. *See Di Roma*, 1993 WL 496981, at *1. Vaccine Program attorneys still have the duty to investigate a Vaccine Act claim even if they find their client to be credible in describing the claim's purported factual basis. Here, Mr. Shoemaker should have done more to probe Mr. Livingston's recollection, and should also have taken into account that Petitioner is not himself a medical professional - and therefore his unsubstantiated belief, however sincerely held, that he had witnessed D.L. receive RotaTeq could easily be erroneous.

Petitioner is similarly incorrect in arguing that an attorney's obligation to "zealously" pursue his client's claim justifies the investigatory efforts in this case. *See* Reply at 5; MODEL RULES OF PROF'L CONDUCT R. 1.3 cmt. Even if Vaccine Program counsel are properly expected to do all in their power to advance their client's claim, such efforts must serve an honest analysis of the claim's strengths and weaknesses. *See Perreira v. Sec'y of Health & Human Servs.,* 27 Fed. Cl. 29, 35 (Fed. Cl. 1992) ("[w]hile an attorney has an ethical obligation to be a zealous advocate

---

[17] The "totality of the circumstances" includes the conduct of a petitioner's counsel. *Chuisano*, 116 Fed. Cl. at 288. I thus find that Mr. Shoemaker's performance of attorney tasks in this matter, such as his investigative efforts, and in light of his extensive Program experience, is relevant herein.

[18] Thus, here Mr. Livingston appears to have confused D.L.'s receipt of Rondec with RotaTeq (*see* p. 6 above), while in *Rydzewski* the petitioner confused hexabrix with Hepatitis B. *Rydzeski*, 2008 WL 382930, at *4. Counsel appears to understand as well that the common nature in which the two are administered (orally) could have been another basis for Petitioner's confusion. *See* Reply at 1 ("[Petitioner] also referred to the fact that he didn't remember any of [his other children] getting all the doses of that "liquid vaccine").

for the client's cause, this does not mean that an attorney has license to proceed with a frivolous case on behalf of the client"), *aff'd,* 33 F.3d 1375, 1377 (Fed.Cir.1994).[19] An inefficient and unfocused investigation into the bases for a claim is not justified by the desire to serve the client well.

Program attorneys enjoy the benefit of a uniquely generous fees statute that compensates them under circumstances for which attorneys practicing in other civil contexts would not expect to be paid. As a result, it is not unfair to place the risk of nonpayment upon Program counsel in those rare instances in which a nonviable claim is unreasonably pursued. *McCabe v. Sec'y of Health & Human Servs.,* 1993 WL 135860, at *2 (Fed. Cl. Spec. Mstr. Apr. 15, 1993) ("it is . . . reasonable to put on [petitioners] the risk of not being compensated for attorneys' fees and costs if they file a petition without the necessary supporting documentation and are later unable to produce such documentation"). Here, I find that the overall circumstances do not justify a fees award.

## CONCLUSION

Accordingly, in the exercise of the discretion afforded to me in determining the propriety of fee awards in unsuccessful Program cases, and based on the foregoing, I DENY Petitioner's Motion for Attorney's Fees in its entirety. In the absence of a motion for review filed pursuant to RCFC Appendix B, the clerk of the court **SHALL ENTER JUDGMENT** in accordance with the terms of this decision.[20]

**IT IS SO ORDERED.**

s/Brian H. Corcoran
Brian H. Corcoran
Special Master

---

[19] Petitioner also argues that reasonable basis is supported by the fact that the RotaTeq package insert acknowledges some risks from its administration. Reply at 2. But whether or not a given vaccine "can cause" injury after its administration is irrelevant if the vaccine cannot be shown to have been administered in the first place.

[20] Pursuant to Vaccine Rule 11(a), the parties may expedite entry of judgment if (jointly or separately) they file notices renouncing their right to seek review.